## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WINE ACCESS, INC.,        :
                          :
                          :     Case No.
         Plaintiff,        :
                          :     Judge
    v.                     :
                          :
DAVID ZUROWSKI,       :
                          :
         Defendant.     :
                          :

## VERIFIED COMPLAINT

1.     For more than four years, Wine Access, Inc. (WineAccess) placed its former Vice President of Winery Sourcing, David Zurowski, in a position of trust, providing him with access to WineAccess's most sensitive trade secrets and customer relationships.  Toward the end of his tenure with WineAccess, Mr. Zurowski misappropriated corporate opportunities for the benefit of a competitor.   In the spring of 2016, shortly before **and after** his resignation from WineAccess, Mr. Zurowski gravely betrayed that trust by stealing WineAccess's trade secrets, so that he could use them to compete unfairly with WineAccess.  As we prepare this Complaint, Mr. Zurowski is using those trade secrets for the benefit of one of WineAccess's chief competitors, Vivino.  WineAccess brings this lawsuit, under the Defend Trade Secrets Act of 2016 (P.L. 114-153) ("DTSA"), the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. §§ 5301-5308 ("PUTSA"), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA") and the common law of Pennsylvania, primarily to obtain emergency injunctive relief designed to prevent Mr. Zurowski from carrying out his scheme and inflicting more irreparable harm on WineAccess.  WineAccess also seeks monetary relief and attorneys' fees.

## JURISDITION AND VENUE

2.     The Court has federal-question jurisdiction over the DTSA and CFAA claims under 28 U.S.C. § 1331.

3.     The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

4.     An additional basis for this Court's jurisdiction is 28 U.S.C. § 1332(a).  Under Section 1332(a), federal courts have original jurisdiction over actions in which the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

5.     WineAccess is incorporated under the law of Pennsylvania and has its headquarters in Ardmore, Pennsylvania, from which the corporation's officers direct, control, and coordinate its activities.  Accordingly, WineAccess is a citizen of Pennsylvania for diversity purposes.

6.     Mr. Zurowski, in recent years, has resided in Napa, California.  Mr. Zurowski remains a resident of the State of California, where he has substantial familial ties and business interests and where he intends to remain.  Accordingly, he is a citizen of the State of California for diversity purposes.

7.      WineAccess seeks damages arising out of Mr. Zurowski's misappropriation of its trade secrets and his breach of his employment agreement and injunctive relief.  The value of these remedies exceeds $75,000.

8.     Venue is proper under 28 U.S.C. § 1391(a)(2), because a substantial part of the events giving rise to WineAccess's claims occurred in this jurisdiction, including Mr. Zurowski's

hiring, the execution of his employment agreement, and the misappropriation of WineAccess's trade secrets.

9.     Mr. Zurowski primarily worked for WineAccess out of its office in Napa, California but frequently traveled for his position, including to the WineAccess headquarters in Ardmore, Pennsylvania..

10.     The Court has personal jurisdiction over Mr. Zurowski because he regularly conducts business within Pennsylvania and because his unlawful conduct was deliberately designed to harm a citizen of Pennsylvania.

## FACTUAL BACKGROUND

### WineAccess Is A Bridge Between Wine Consumers And Wine Producers

11.     WineAccess is in the information business, acting as a bridge between wine consumers and wine producers.

12.     WineAccess benefits wine consumers by using proprietary software, accessible at www.wineaccess.com (the "WineAccess Website"), to provide wine consumers with a complete, on-line buyer's guide, a place to search, compare prices, learn about regions, varieties, vintages and the winegrowers themselves.  The WineAccess Website includes customer, retailer and winery information assembled and compiled by WineAccess, including product reviews and other information about customers, retailers and kinds of wine that may be currently available.

13.     The WineAccess Website offers consumers more than 50,000 wines for sale, and information on another 150,000 that may be currently out of stock in the WineAccess store network.

14.     Each day, WineAccess posts on the WineAccess Website and releases to its subscribers several offers for particular wines from many of its partner-wineries.  These offers

consist of a story about a wine from one of the partner-wineries that is written by the CEO and Founder of WineAccess, Jim Weinrott.

15.    WineAccess also benefits consumers by negotiating lower prices with wineries: As part of the offer, the wineries typically agree with WineAccess to offer the product for a significant discount.    The details about the pricing structure for the WineAccess offers are confidential and not disclosed to the public.

16.    WineAccess does not charge consumers for providing any of these services.

17.    In sum, WineAccess benefits consumers by educating them about wines and then offering wines suited to each consumer's taste at a lower cost.

18.    WineAccess benefits wine producers by helping them to reach consumers: WineAccess has compiled and assembled a list of e-mail addresses of users that have registered to use the WineAccess Website and uses those email addresses in solicitations to purchase other wines included in constantly changing and updated sales campaigns in which customers can place orders for wine directly with participating wineries offering those products.

## WineAccess's Trade Secrets Are Its Life Blood

19.    Because WineAccess is in the information business, its survival depends largely on its trade secrets.

20.    WineAccess maintains a database of all contact information with partner-wineries and potential partner-wineries detailing the sales and marketing strategy that WineAccess uses for each specific winery.

21.    The information in this database includes virtually every detail about every offer on the WineAccess Website during WineAccess's existence, including confidential pricing information related to service fees and e-commerce fees it charges its winery customers.  This

information is proprietary to WineAccess, is maintained as confidential, as is not shared with anyone outside of a limited group of WineAccess employees.

22.    Two databases containing WineAccess's trade secrets are of particular salience to this case: the Margin Calculator and the Client Relations Manager ("CRM") database.

23.    The Margin Calculator is a proprietary tool created by WineAccess that contains confidential pricing secured by WineAccess with the partner-wineries and fulfillment partners and historical data about sales distributions by state, order size, and price paid by the consumer for purposes of negotiating offers with partner-wineries.

24.    The compilation of data within the Margin Calculator controls the offer-negotiation process and the associated WineAccess profit margin on such offers.

25.    WineAccess has expended significant time and resources creating the Margin Calculator so that the sourcing team is able to negotiate pricing with partner-wineries that result in profitable offers for WineAccess.

26.    The data in the Margin Calculator are available only to a select group of employees subject to confidentiality agreements.

27.    A competitor in possession of the information in the Margin Calculator could use that data to undercut WineAccess's position in the market.

28.    The CRM database is a tool used by WineAccess's sourcing and production teams to store information about potential and current partner-wineries.

29.    The CRM database contains a detailed history about each offer that WineAccess has made or attempted to negotiate during the past three years, including the price per case that the partner-winery receives, the minimum price that the product could be offered for through the

WineAccess Website, estimated top-line revenue, and in some instances, total bottles sold and actual topline revenue.

30.     The CRM database also includes detailed information about key stakeholders at each of the partner-wineries entered.

31.     WineAccess has expended time and resources creating the CRM database to enable the sourcing team to determine whom it should contact at partner-wineries and the parameters of the prices that it can negotiate based on historical data about similar offers.

32.     WineAccess has exercised, and continues to exercise, reasonable efforts to protect its trade secrets, including the data in the Margin Calculator and CRM database.

33.     For example, WineAccess requires its employees, and required Mr. Zurowski, to sign a Confidentiality Agreement requiring them, among other things, to preserve the secrecy of WineAccess's Confidential Information.  A copy of Mr. Zurowski's executed Confidentiality and Non-Competition Agreement is attached hereto as Exhibit A.

34.     The Confidentiality Agreement defines "Confidential Information" to include, among other things, the identities of WineAccess's financial and business affairs relating to its customers and customer lists, and its accounting and marketing analyses.

35.     Under WineAccess's Confidentiality Agreement policy, use of Confidential Information outside of WineAccess is strictly restricted, and employees provided with access to WineAccess's Confidential Information are forbidden to use it for their personal advantage or the advantage of a competitor of WineAccess.

36.     WineAccess has also required employees with access to Confidential Information to enter into a Proprietary Information and Inventions Agreement that also requires them, among other things, to maintain the secrecy of WineAccess's Proprietary Information.

37.    The Proprietary Information and Inventions Agreement defines "Proprietary Information" to include, financial information related to the Company, its business or its anticipated business.

38.    The Proprietary Information and Inventions Agreement also requires that the employees agree to "hold in confidence and not disclose" any Proprietary Information unless doing so is within the scope of their employment.

39.    WineAccess also password protects such information to keep it under a digital lock and key.

40.    When WineAccess has to share trade secrets with a customer or business partner, or requires access to a customer's or business partner's secrets, WineAccess requires a nondisclosure agreement with that customer or business partner.

41.    As a result of these efforts, WineAccess's trade secrets are of particular importance to WineAccess and constitute competitive value to WineAccess.

42.    WineAccess has expended substantial amounts of time, money, and resources in developing trade secrets.

**Beginning In April 2012, WineAccess Places Mr. Zurowski In a Special Position Of Trust, And Provides Him With Access To Its Secrets**

43.    Critical to WineAccess's success is its sourcing team: professionals who focus on developing and maintaining relationships with wineries to find potential products for WineAccess to offer to its subscribers.

44.    WineAccess hired Mr. Zurowski in April of 2012 to be the Vice President of Winery Sourcing. Mr. Zurowski's employment offer, which he accepted, included compensation of $150,000 per year plus commission, opportunity for bonuses, and stock options.

45.    Mr. Zurowski's specific responsibilities included developing relationships with wineries and maintaining relationships with more than 125 existing wineries—all with the goal of ensuring that WineAccess was able to continue to create high-quality offers for wines each day to its subscriber base.

46.    As a condition of Mr. Zurowski's employment offer, WineAccess required Mr. Zurowski to enter into the Confidentiality Agreement, which included a Non-Competition provision.

47.    The Non-Competition provision required Mr. Zurowski to agree that he would not, for a period of one year after his termination of employment, "be connected as an officer, director, employee, partner, principal, agent, representative, consultant or otherwise with . . . any business or enterprise which is engaged in any business that is competitive with any business or enterprise in which [WineAccess] is engaged, within the Company's 'Service Area' . . . ." The Service Area is defined as the United States of America and Mr. Zurowski acknowledged that "the Service Area is the area in which [WineAccess] presently does business."

48.    Mr. Zurowski agreed to the Non-Competition provision when he accepted WineAccess's offer of employment.

49.    To carry out those responsibilities, Mr. Zurowski required access to WineAccess's trade secrets, such as cost and pricing information, profit margins, business plans, marketing strategies, financial projections, the terms of specific agreements with wineries, and confidential information about WineAccess's partner-wineries.

50.    Mr. Zurowski had access to the data in the Margin Calculator and the CRM database.

## In June 2016, Mr. Zurowski Resigns From WineAccess

51.     On June 2, 2016, Mr. Zurowski e-mailed Mr. Weinrott and submitted his resignation.  In the e-mail, Mr. Zurowski wrote that the reason for his departure was because he "decided to put [his] energy toward new opportunities and to dedicate more time to [his] family and [his] wife while she is launching her new business."  Mr. Zurowski also wrote that "[Mr. Weinrott] instilled a great level of honesty in the way [Mr. Zurowski] approach[es] the wine business as a whole."

52.     In the email, Mr. Zurowski offered to assist WineAccess to find his replacement. Mr. Zurowski also promised that he would "pass along any communications [he] currently [had] with suppliers, brokers or importers" and that he would "bundle all current and past documents on a flash drive and remove them from [his] computer."  Mr. Zurowski concluded by promising that he would "continue to recommend [WineAccess] to suppliers that seek the best way to sell their wine in the digital world."

53.     Given the cooperative tenor of his resignation letter, WineAccess permitted Mr. Zurowski to continue to work for the Company to transition his role to another member of the sourcing team.

54.     Because the transition was complete on June 10, 2016, that was Mr. Zurowski's last day at WineAccess.

55.     On June 10, 2016, Mr. Zurowski acknowledged the conclusion of his employment by sending a "farewell" e-mail to the entire staff that evening, wherein he wrote "I am headed off to explore new horizons, what exactly is TBD but I know it'll be entertaining."

56.     At the time that Mr. Zurowski sent this e-mail, he knew that he was no longer employed by WineAccess.

57.    At the time he sent the e-mail, Mr. Zurowski knew that he had no authority to access WineAccess's computer system.

58.    After sending the e-mail, Mr. Zurowski knew that he had no more authority to use his old WineAccess email address.

59.    After Mr. Zurowski left WineAccess, the Vice President of Operations, Jessica Lantis, began monitoring Mr. Zurowski's WineAccess e-mail account to distribute to the sourcing team any e-mails that required a response.

60.    To date, Mr. Zurowski has not provided WineAccess with a flash drive with WineAccess documents or information or provided any indication that he deleted all of WineAccess's information off of his computer.

### In July 2016, Wine Access Learns Mr. Zurowski Betrayed Its Trust, Stole WineAccess's Secrets, And Is Using Those Secrets To Benefit A Competitor

61.    On Monday, June 27, 2016, while checking Mr. Zurowski's e-mail account, Ms. Lantis found an e-mail from Kari Kittinger, Sales for Baker Lane Vineyards, with the subject line, "Baker Lane Colors Vivino Offer." Ms. Kittinger wrote, "[j]ust checking in on our Baker Lane 2013 Colors Pinot and Syrah offerings. Let me know a timeline for the launch."

62.    On Tuesday, June 28, 2016, Ms. Kittinger wrote another email stating "[m]y apologies. Wrong e-mail for David."

63.    As a result of these e-mails, the Senior Vice President of Winery Relations, Angelo Brutico, contacted his connection at Baker Lane but did not receive any response.

64.    On Friday, July 1, 2016, Mr. Brutico received an e-mail from Joel Cotton, at Southern Wine & Spirits, the largest wine and spirits distributor in the United States, which included a forwarded e-mail from Vivino's Chief Business Development Officer, Peter Ekman, stating "[w]hat was your progress with Round Pond? David Zurowski at VB has a 12 year long

relationship with them and has developed all the Wineaccess exclusive labels with them. He can get this winery going for Vivino but that needs your approval."

65.    Upon information and belief, the "VB" referenced by Mr. Ekman was Vintage Berkley, LLC, a retail affiliate of Vivino.

66.    As a result of receiving the e-mail indicating that Mr. Zurowski was working for an affiliate of Vivino and the e-mail from Baker Lane indicating that Mr. Zurowski facilitated an offer for Vivino, Ms. Lantis began to review the e-mails that Mr. Zurowski sent and received in the months leading up to his resignation.

67.    During the investigation, WineAccess first discovered that Mr. Zurowski originally initiated contact with Baker Lane on April 16, 2016 to discuss offering wine through WineAccess.  After multiple exchanged e-mails between Mr. Zurowski and Ms. Kittinger, Ms. Kittinger offered 200 cases of the 2013 Colors Pinot Noir and 200 cases of the 2013 Colors Syrah to be offered on the WineAccess Website.  Mr. Zurowski asked that Ms. Kittinger send two samples, as the usual course of offering a wine through the WineAccess Website included the winery providing two samples, one of which would be sent to the WineAccess headquarters in Ardmore.  By May 16, 2016, Ms. Kittinger inquired from Mr. Zurowski the status of the offer with WineAccess. Mr. Zurowski responded that the wine was "in the queue" and that he expected that the offer would be "live in the coming week."

68.    As a result of discovering this e-mail chain, WineAccess checked its CRM database to determine whether Mr. Zurowski had ever entered the 2013 Baker Lane wines into the queue.  He had not.  Mr. Zurowski also never sent the samples that Ms. Kittinger sent to WineAccess.

69.    The most logical inference from these facts is that Mr. Zurowski used WineAccess's Confidential Information and trade secrets to facilitate an offer with Baker Lane while working for WineAccess and did not enter the information into WineAccess's CRM database or send the samples to Ardmore, because he intended to pursue the offer with Vivino.

70.    As Ms. Lantis continued to search Mr. Zurowski's e-mail, she discovered that Mr. Zurowski downloaded multiple reports from WineAccess's CRM system.

71.    On May 12, 2016 at 4:34 p.m., 4:43 p.m. and 5:48 p.m., Mr. Zurowski downloaded three reports from the CRM system that comprised all of the offers, all of the contacts, and all of the wineries that WineAccess maintained in the database.

72.    Downloading this information was not necessary for Mr. Zurowski to perform his job responsibilities and he would have had no legitimate reason for doing so.  Indeed, until Mr. Zurowski downloaded these reports, he had not downloaded the same type at any point during his employment.

73.    Ms. Lantis contacted the CRM database provider, PipelineDeals and learned that Mr. Zurowski made additional downloads after his resignation, including a download after Mr. Zurowski was no longer WineAccess's employee.

74.    On June 6, 2016 at 4:01 p.m., Mr. Zurowski downloaded "all_companies" export from the CRM database, which included detailed information about over 800 wineries.

75.    One June 9, 2016 at 11:21 p.m., Mr. Zurowski downloaded "all_deals" export from the CRM database, which included detailed information about approximately 1400 offers.

76.    On June 11, 2016 at 8:51 p.m., **the day after his final day at WineAccess**, Mr. Zurowski downloaded "all_deals" export from the CRM database.

77.    Downloading this information was not necessary for Mr. Zurowski to perform his job responsibilities.

78.    Mr. Zurowski made the June 6 and June 9 downloads after he had resigned and when he was winding down his employment.  He had no legitimate reason to access such a vast array of data at that time.

79.    Because the June 11 download occurred **one day after** Mr. Zurowski stopped working for WineAccess, it is impossible for there to have been a legitimate reason for Mr. Zurowski to have downloaded that data.

80.    The June 11 download was an act of hacking, pure and simple.

81.    The files downloaded by Mr. Zurowski on June 6, 9, and 11, 2016 contained lists of all current and potential partner-wineries, internal pricing information, and historical financial information about the offers, which are covered by WineAccess's Confidentiality Agreement and Proprietary Information and Inventions Agreement and subject to the protective measures discussed above.

82.    Those data are valuable to WineAccess because they are secret.  A competitor in possession of this information would have insight into the pricing that WineAccess was able to negotiate with partner-wineries, the terms on which the offers were made, the amounts sold, the contacts at each winery, and the sales history for the offers through the WineAccess Website, and could therefore better target those wineries by knowing WineAccess's internal pricing structure.  WineAccess competitors would, if they read this information, also have insight into the identities of the key stakeholders at a winery and the winery's needs, and thus be able to compete more effectively in relation to that winery.

83.    The investigation into Mr. Zurowski's e-mail account has also revealed that Mr. Zurowski began sending e-mails to his own personal e-mail accounts containing secret information about potential WineAccess offers.

84.    On April 5, 2016 at 6:26 p.m., Mr. Zurowski forwarded an e-mail to "dz@trumotus.com" that contained an e-mail from Dennis Yeast of Pacific Wines that included an attachment with prices that were being offered exclusively to WineAccess. Dz@trumotus.com is a personal e-mail address of Mr. Zurowski's.

85.    The information in the attachment to the e-mail from Mr. Yeast contained confidential information about prices for an offer exclusive to WineAccess. The information was therefore covered by the Confidentiality Agreement. The pricing information offered to WineAccess would be valuable to a competitor because it would permit the competitor to understand the pricing that WineAccess was able negotiate with the partner-winery and therefore negotiate more attractive terms with the winery.

86.    Mr. Zurowski had no legitimate business need to send Mr. Yeast's e-mail to his personal e-mail address. WineAccess utilizes the Gmail platform that allows for employees to access their e-mail anywhere that they have access to the internet. As a result, an employee like Mr. Zurowski could access his WineAccess e-mail from any place where he could access his personal e-mail accounts. Thus, there is no legitimate need for Mr. Zurowski to send an e-mail to his personal account.

87.    On May 4, 2016 at 4:59 p.m., Mr. Zurowski included "zurowski@me.com" as a "Cc" on an e-mail to Matt Naumann of Failla Wines. "Zurowski@me.com" is a personal e-mail address of Mr. Zurowski.

88.     The e-mail included pricing negotiations based on WineAccess's Confidential Information and trade secrets.  The information contained in the e-mail to Mr. Naumann was confidential because it included a price that Failla Wines might offer through the WineAccess Website based on prior dealings with the Company.  Therefore the information was covered by the Confidentiality Agreement. The pricing information offered to WineAccess would be valuable to a competitor because it would permit the competitor to understand the pricing that WineAccess was able to negotiate with the partner-winery and therefore negotiate more attractive terms with the winery.

89.     Mr. Zurowski had no legitimate business need to send his e-mail to Mr. Naumann to his personal e-mail address

90.     Since Mr. Zurowski's last day of employment, Vivino has published six offers for WineAccess's partner-wineries that were contained in the data downloaded by Mr. Zurowski.

91.     If the information in the downloads were to become public, it would harm WineAccess's relations with its winery-partners: those partners would question WineAccess's ability to maintain the confidentiality of the discounts being offered to sell their products through WineAccess.

92.     After learning the aforementioned facts, WineAccess retained a firm that specializes in the acquisition, authentication, investigation, and analysis of electronic data to investigate Mr. Zurowski's recent activity of his work e-mail and the CRM system.  That investigation has cost WineAccess more than $1,000, a cost that will increase.

93.     Although WineAccess's investigation into Mr. Zurowski's wrongdoing is ongoing, it now knows enough to conclude that Mr. Zurowski grossly betrayed the trust WineAccess reposed in him.  While he was still WineAccess's Vice President of Winery

Sourcing, and being paid handsomely for his work, Mr. Zurowski began misappropriating business opportunities that he had a duty to use for WineAccess's benefit. During and shortly after his employment, Mr. Zurowski improperly accessed WineAccess's database and stole its trade secrets, so that he could use them to compete unfairly against WineAccess. Because of the urgent and existential threat Mr. Zurowski's actions pose to WineAccess, it brings the following claims.

## COUNT I: DEFEND TRADE SECRETS ACT OF 2016 114 P.L. 153

94.    WineAccess incorporates by reference the preceding paragraphs.

95.    Mr. Zurowski has disclosed WineAccess's trade secrets to at least one third party, Vivino, Inc. or one of its affiliates.

96.    He also downloaded trade secrets after he ceased to be an agent of WineAccess, in flagrant defiance of his agreements with WineAccess directions.

97.    Mr. Zurowski's course of conduct strongly suggests that, if not enjoined to return WineAccess's trade secrets and to refrain from working for a competitor of WineAccess for at least 12 months, he will continue to disclose, and will use, WineAccess's trade secrets: the material that he downloaded on May 12, 2016, June 6, 2016, June 9, 2016 and June 11, 2016 would serve no useful purpose except for being used to compete with WineAccess.

98.    Because the material that he downloaded to himself on May 12, 2016, June 6, 2016, June 9, 2016 and June 11, 2016 would serve no useful purpose except for being used to compete with WineAccess, the most logical inference is that Mr. Zurowski has already used that material to compete with WineAccess, or has provided it to a third party, including Vivino or its affiliates that has used the information thus.

99.    Mr. Zurowski's misappropriation of WineAccess's trade secrets has been willful and malicious.

100.    As a result of Mr. Zurowski's completed and threatened misappropriation, WineAccess has suffered, and will continue to suffer, damage or loss.

101.    Mr. Zurowski thus misappropriated WineAccess's trade secrets within the ambit of the Defend Trade Secrets Act.

## COUNT II: MISAPPROPRIATION OF TRADE SECRETS

102.    WineAccess incorporates by reference paragraphs 1 through 92.

103.    Mr. Zurowski has disclosed WineAccess's trade secrets to at least one third party, Vivino, Inc. or one of its affiliates.

104.    He also downloaded trade secrets after he ceased to be an agent of WineAccess, in flagrant defiance of his agreements with WineAccess directions.

105.    Mr. Zurowski's course of conduct strongly suggests that, if not enjoined to return WineAccess's trade secrets and to refrain from working for a competitor of WineAccess for at least 12 months, he will continue to disclose, and will use, WineAccess's trade secrets: the material that he downloaded on May 12, 2016, June 6, 2016, June 9, 2016 and June 11, 2016 would serve no useful purpose except for being used to compete with WineAccess.

106.    Because the material that he downloaded to himself on May 12, 2016, June 6, 2016, June 9, 2016 and June 11, 2016 would serve no useful purpose except for being used to compete with WineAccess, the most logical inference is that Mr. Zurowski has already used that material to compete with WineAccess, or has provided it to a third party, including Vivino or its affiliates that has used the information thus.

107.    Mr. Zurowski's misappropriation of WineAccess's trade secrets has been willful and malicious.

108.    As a result of Mr. Zurowski's completed and threatened misappropriation, WineAccess has suffered, and will continue to suffer, damage or loss.

109.    Mr. Zurowski thus misappropriated WineAccess's trade secrets within the ambit of 12 Pa. C.S.A. § 5302.

### COUNT III: COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. §§ 1030(a))

110.    WineAccess incorporates by reference paragraphs 1 through 92.

111.    Mr. Zurowski intentionally accessed WineAccess's protected computer, as its CRM database is an electrical, high-speed data processing device that performs storage functions and is used in interstate commerce or communications.

112.    Mr. Zurowski accessed and obtained files on WineAccess's protected computers with utterly no authorization, including downloading the entire business database without any need to do so and accessing the database the day after Mr. Zurowski ceased to be employed by WineAccess and had an obligation under his Confidentiality Agreement to not use any of WineAccess's Confidential Information.  Defiantly, Mr. Zurowski ignored his obligations.

113.    By accessing and downloading WineAccess's confidential computer files after his employment had ended, Mr. Zurowski caused damage, in that he impaired the integrity of WineAccess's trade secrets.

114.    Mr. Zurowski's unlawful actions with respect to WineAccess's computers have caused WineAccess more than $5,000 in loss.

115.    Mr. Zurowski thus violated 18 U.S.C. § 1030(a).

### COUNT IV: BREACH OF CONTRACT

116.    WineAccess incorporates by reference paragraphs 1 through 92.

117.    At the commencement of his employment, Mr. Zurowski entered into a Confidentiality Agreement with WineAccess that prohibited from disclosing its Confidential Information and required that he return all Confidential Information at the termination of his employment.

118.    Mr. Zurowski also entered into the Proprietary Information and Inventions Agreement, which similarly required him not to disclose any of WineAccess's Proprietary Information.

119.    Mr. Zurowski has breached the aforementioned agreements by 1) disclosing Confidential and Proprietary Information to Vivino and its affiliates; and 2) not returning all Confidential and Proprietary Information to WineAccess at the termination of his employment.

120.    Mr. Zurowski's actions were intentional, willful, outrageous, and malicious, and justify the imposition of exemplary damages.

### COUNT V: BREACH OF CONTRACT

121.    WineAccess incorporates by reference paragraphs 1 through 92.

122.    In exchange for his offer of employment with WineAccess, Mr. Zurowski entered into Non-Competition agreement.   The Non-Competition provision prohibited Mr. Zurowski from working for a competitor of WineAccess for a period of one year after his termination from employment.

123.    The Non-Competition agreement was reasonable in both temporal and geographic scope and was necessary to protect WineAccess's legitimate business interests.

124.    Mr. Zurowski violated the Non-Competition provision by becoming employed by or consulting for a business that is directly competitive with WineAccess.

125.    Mr. Zurowski's actions were intentional, willful, outrageous, and malicious, and justify the imposition of exemplary damages.

## COUNT VI: CONVERSION

126.    WineAccess incorporates by reference paragraphs 1 through 92.

127.    Mr. Zurowski has intentionally exercised dominion and control over WineAccess's property, including its computer network, trade secrets, and Confidential Information, so as to interfere with WineAccess's right to control that property.

128.    Mr. Zurowski's actions were intentional, willful, outrageous, and malicious, and justify the imposition of exemplary damages.

## COUNT VII: BREACH OF FIDUCIARY DUTY

129.    WineAccess incorporates by reference paragraphs 1 through 92.

130.    As Vice President of Winery Sourcing, Mr. Zurowski was a management-level employee and had a fiduciary duty to WineAccess. Furthermore, Mr. Zurowski was required to utilize WineAccess's resources to further WineAccess's business.

131.    By negotiating an offer with a partner-winery of WineAccess to facilitate an offer for Vivino during his employment with WineAccess, Mr. Zurowski breached his fiduciary duty and caused damage to WineAccess.

132.    Mr. Zurowski's actions were intentional, willful, outrageous, and malicious, and justify the imposition of punitive damages.

## COUNT VIII: UNJUST ENRICHMENT

133.    WineAccess incorporates by reference paragraphs 1 through 92.

134.    By copying, taking, possessing, and using WineAccess's Confidential Information and trade secrets, including but not limited to the Margin Calculator and data from

the CRM database, without any right to the same, Mr. Zurowski has unjustly enriched himself at WineAccess's expense.

## PRAYER FOR RELIEF

WHEREFORE, WineAccess demands judgment against Mr. Zurowski and requests the following relief:

a.    Preliminary and permanent injunctive relief requiring Mr. Zurowski to (i) return and refrain from using WineAccess's property, including its trade secrets and Confidential Information; (ii) adhere to prophylactic measures designed to verify his compliance with the duties in section (i); and (iii) refrain from working for a competitor of WineAccess for 12 months.

b.    A judgment in WineAccess's favor and against Mr. Zurowski for monetary damages, including, but not limited to, all amounts necessary to compensate WineAccess for Mr. Zurowski's wrongful activities, including compensatory damages, exemplary damages, punitive damages, reasonable attorneys' fees and costs, and the cost of the forensic investigation, as per 114 P.L. 153, 18 U.S.C. § 1030(g), 12 Pa. C.S.A. §§ 5304-05, and the common law.

c.    A judgment in WineAccess's favor and against Mr. Zurowski for exemplary damages under 114 P.L. 153, 12 Pa. C.S.A. § 5304(b) and under the common law.

Matthew J. Hank, (Pa. Atty. No. 86086)
Paul C. Lantis, (Pa. Atty. No. 309240)
Alexa Laborda-Nelson, (Pa. Atty. No. 314652)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321

Attorneys for Plaintiff
Wine Access, Inc.

Dated: July 11, 2016

## VERIFICATION

I, Jim Weinrott, WineAccess's President and Founder, hereby verify and declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the facts and information set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief. I understand that a false statement in this Verification will subject me to penalties of perjury.

Dated: _____                    _____
                                           Jim Weinrott

# Exhibit A

# wine*access*

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

In consideration of my employment by Wine Access, Inc., its subsidiaries and any successors or assigns (the "Company"). and intending to be legally bound. I agree as follows:

1    Confidentiality.  I agree that my services to the Company are of a special, unique and extraordinary character, and that my position places me in a position of confidence and trust with the Company's customers and employees.  I also recognize that my position with the Company will give me substantial access to Confidential Information (as that term is defined below), the disclosure of which to competitors of the Company would cause the Company to suffer substantial and irreparable damage.  I recognize. therefore. that it is in the Company's legitimate business interest to restrict my use of Confidential Information for any purposes other than the discharge of my employment duties at the Company, and to limit any potential appropriation of Confidential Information by me for the benefit of the'Company's competitors and to the detriment of the Company.  Accordingly. I agree as follows:

(1)    During and after my employment by the Company, I will not disclose to any other person or company, nor use for my own personal benefit. except as may be necessary in the performance of my duties as an employee of the Company. any Confidential Information disclosed to me or of which I become aware by reason of my employment or association with the Company.

(2)    The term "Confidential Information" means any and all data and information relating to the business of the Company (whether or not it constitutes a trade secret). which is or has been disclosed to me or of which I became aware as a consequence of my employment or relationship with the Company. and which has value to the Company and is not generally known by its competitors, including but not limited to information relating to experimental and research work of the Company. the Company's methods. processes. tools. machinery. formulas. drawings or appliances. and the financial or business affairs of the Company relating to services, customers, customer lists. employees or employees' compensation. projections. plans, development, accounting and marketing studies or analyses.  Confidential Information shall not include any data or information that has been disclosed voluntarily to the public by the Company (except where such public disclosure has been made by me or some other person without authorization), or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful and legitimate means.

(3)    I agree that upon the termination of my employment with the Company, I will not take with me or retain without written authorization any documents. files or other property of the Company, and I will return promptly to the Company any such documents. files or property in my possession or custody.  In connection with this Agreement, I recognize that all documents. files and property which I have received and will receive from the Company including but not limited to customer lists, handbooks. memoranda. policy manuals. product specifications. and other materials (with the exception of documents relating to benefits to which I might be entitled following the termination of my employment with the Company). are for the exclusive use of the Company and employees who are discharging their responsibilities on behalf of the Company,

and that I have no claim or right to the continued use, possession or custody of such documents, files or property following the termination of my employment with the Company.

2.     <u>Intellectual Property</u>.  I will communicate to the Company any and all novel ideas, concepts, inventions, processes, and improvements, patentable or unpatentable, made or conceived by me, either solely or jointly with others, from the time of entering the Company's employ until I leave, along the line of the Company's business, or resulting from or suggested by any work which I may do for the Company, or at its request, and I will, at all times during my employment with the Company and after its termination for any reason, assist the Company in every proper way (at the Company's expense), to obtain for its own benefit patents for any or all of these ideas, concepts, inventions, processes and improvements in the United States and any and all foreign countries, if patentable, by executing and delivering to the Company any and all applications, assignments, and other instruments, by giving evidence and testimony, and by executing and delivering to the Company all drawings, blueprints, notes, and specifications deemed necessary by the Company in order to apply for and obtain letters patent of the United States or foreign countries for such ideas, concepts, inventions, processes and improvements, and I do hereby assign and will assign and convey to the Company my entire right, title and interest in and to all such ideas, concepts, inventions, processes, and improvements, and all patent applications and patents thereon.  I further agree to conduct myself as described above after leaving the Company's employment as to all ideas, concepts, inventions, processes and improvements conceived or disclosed while with the Company.

3.     <u>Non-Competition</u>.

(1)     During my employment by the Company and for a period of one year after my termination of employment for any reason, I will not, except with the prior written consent of the Board of Directors of the Company (the "Board"), directly or indirectly, own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, partner, principal, agent, representative, consultant or otherwise with, or use or permit my name to be used in connection with, any business or enterprise which is engaged in any business that is competitive with any business or enterprise in which the Company is engaged, within the Company's "Service Area," as defined below.  For the purposes of this Section, "Service Area" shall mean the United States of America.  I acknowledge that the Service Area is the area in which the Company presently does business.

(2)     The foregoing restrictions shall not be construed to prohibit my ownership of less than five percent of any class of securities of any corporation which is engaged in any of the foregoing businesses and has a class of securities registered pursuant to the Securities Exchange Act of 1934, provided that such ownership represents a passive investment and that neither I nor any group of persons including me in any way, either directly or indirectly, manages or exercises control of any such corporation, guarantees any of its financial obligations, otherwise takes any part in its business, other than exercising my rights as a shareholder, or seeks to do any of the foregoing.

*WineAccess, Inc. CONFIDENTIAL*

4.    <u>Non-Solicitation</u>.

(1)    I covenant and agree that during my employment by the Company and for the period of one year thereafter, I will not, directly or indirectly, (i) solicit, divert, take away, or attempt to solicit, divert or take away, any of the Company's "Principal Customers," defined for the purposes hereof to include any customer of the Company, from which $3,000 or more of annual gross revenues are derived at such time, or (ii) encourage any Principal Customer to reduce its patronage of the Company.

(2)    I further covenant and agree that during my employment by the Company and for the period of one year thereafter, I will not, except with the prior written consent of the Board, directly or indirectly, solicit or hire, or encourage the solicitation or hiring of, any person who was an employee of the Company at any time during the term of my employment by the Company by any employer other than the Company for any position as an employee, independent contractor, consultant or otherwise.  The foregoing covenant shall not apply to any person after 12 months have elapsed after the date on which such person's employment by the Company has terminated.

5    <u>General Provisions</u>.

(1)    I acknowledge and agree that the type and periods of restrictions imposed in this Agreement are fair and reasonable, and that such restrictions are intended solely to protect the legitimate interests of the Company, rather than to prevent me from earning a livelihood.  I recognize that the Company competes throughout the United States, and that my access to Confidential Information makes it necessary for the Company to restrict my post-employment activities in any market in which the Company competes, and in which my access to Confidential Information and other proprietary information could be used to the detriment of the Company   In the event that any restriction set forth in this Agreement is determined to be overbroad with respect to scope, time or geographical coverage, I agree that such a restriction or restrictions should be modified and narrowed, either by a court or by the Company, so as to preserve and protect the legitimate interests of the Company as described in this Agreement, and without negating or impairing any other restrictions or agreements set forth herein.

(2)    I acknowledge and agree that if I should breach any of the covenants, restrictions and agreements contained herein, irreparable loss and injury would result to the Company, and that damages arising out of such a breach may be difficult to ascertain.  I therefore agree that, in addition to all other remedies provided at law or at equity, the Company may petition and obtain from a court of law or equity all necessary temporary, preliminary and permanent injunctive relief to prevent a breach by me of any covenant contained in this Agreement.  I agree further that if it is determined by a court that I have breached the terms of this Agreement, the Company shall be entitled to recover from me all costs and attorneys' fees incurred as a result of its attempts to redress such a breach or to enforce its rights and protect its legitimate interests.

*WineAccess, Inc.* CONFIDENTIAL

(3)    This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with, the laws of the state of Pennsylvania.

(4)    I agree that if the Company fails to take action to remedy any breach by me of this Agreement or any portion of the Agreement, conduct or inaction by the Company shall not operate or be construed as a waiver of any subsequent breach by me of the same or any other provision, agreement or covenant.

(5)    I agree that each covenant, paragraph and division of this Agreement is intended to be severable and distinct, and that if any paragraph, subparagraph, provision or term of this Agreement is deemed to be unlawful or unenforceable, such a determination will not impair the legitimacy or enforceability of any other aspect of the Agreement.

(6)    I hereby state that I have read this Agreement in its entirety, that I have been given an opportunity to consider the Agreement and discuss it with the attorney of my choice, and that I enter into this Agreement voluntarily and intending to be legally bound.

(7)    I agree that the Company may assign this Agreement to any of its successors by merger or otherwise.

By: _____

David Zurowski
*VP, Winery Sourcing*

**WINE ACCESS, INC.**

By:    Jessica Gerber
*Finance Manager*

*WineAccess, Inc. CONFIDENTIAL*